Date signed November 12, 2014



_____
**ROBERT A. GORDON**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (at Baltimore)

| | | |
|---|---|---|
| In re: | * | |
| Edward and Jacqueline Fox | * | Case No. 13-12566-RAG |
| | | Chapter 7 |
| Debtor | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## FINDINGS OF FACT AND CONCLUSIONS OF LAW UPON THE
## UNITED STATES TRUSTEE'S MOTION TO DISMISS FOR ABUSE

Upon consideration of the evidence and arguments presented in support of and in opposition to the United States Trustee's Motion to Dismiss for Abuse, the Court makes the following findings of fact and conclusions of law:

## PROCEDURAL HISTORY

1.      The debtors, Edward and Jacqueline Fox, filed a voluntary petition under chapter 7 of the Bankruptcy Code on February 15, 2013.

2.      In their Petition, the Foxes indicated that their debts were "primarily consumer debts."

3.      On March 26, 2013, the United States Trustee (UST) filed a Motion to Dismiss for Abuse (Motion to Dismiss) pursuant to 11 U.S.C. § 707(b)(3).  Specifically, the UST

1

contended that the Foxes' filing of the case constitutes an abuse under both the "bad faith" test of 11 U.S.C. § 707(b)(3)(A) and the "totality of the circumstances . . . of the debtor's financial situation" test of 11 U.S.C. § 707(b)(3)(B).

4.       In response, the Foxes filed an amended petition in which they changed their designation of "primarily consumer debts" to "primarily business debts."

5.       Because 11 U.S.C. § 707(b) only provides for the dismissal of cases in which the debtors' debts are "primarily consumer debts," on July 26, 2013, the UST filed a Motion for Partial Summary Judgment (Summary Judgment Motion) (Dkt. No. 45) on that issue.

6.       The Foxes did not respond to the Summary Judgment Motion.

7.       The UST was entitled to judgment as a matter of law on that issue based upon the undisputed facts set forth in the Summary Judgment Motion (supported primarily by the deposition testimony of the Foxes themselves) and therefore, the Summary Judgment Motion was granted on October 28, 2013 (Dkt. No. 71) and the Court held that the Foxes' debts are "primarily consumer debts" as defined by the Bankruptcy Code.[1]

8.       The Court held a trial on the Motion to Dismiss on October 29, 2013 and, on January 10, 2014, following the submission of post-trial memoranda, and after hearing argument from both sides, the Court placed a preliminary ruling granting the Motion to Dismiss on the record. The reasoning expressed on the records is incorporated herein. The UST was given the opportunity to submit proposed findings of fact and conclusions of law and the Foxes were given the opportunity to object both informally and formally. The Foxes did not file an objection to the proposed findings of fact and conclusions of law.

---

[1] The term "consumer debt" is defined at 11 U.S.C. § 101(8). Debtors' debts are "primarily consumer debts" if more than 50% of the debts are "consumer debts." *In re Evans*, 334 B.R. 148, 150 (Bankr. D. Md. 2004); *see also In re Stewart*, 175 F.3d 796, 808 (10th Cir. 1999).

**FINDINGS OF FACT**

9.      The Foxes earn gross annual wages of somewhere between $220,000 and $255,000.  Their bankruptcy schedules reflect gross annual wages of $253,640.40 but tax returns from two prior years and testimony at trial indicate that, due to the nature of their employment, the precise amount fluctuates and in 2013, may have been slightly lower than reflected on the Foxes' schedules.

10.      The Foxes also receive approximately $30,000 a year in rental income.  That income, however, is not disclosed on their schedules.

11.      Although the Foxes testified that some of their children and grandchildren are now residing in their house, the Foxes do not have any financial responsibility for those children or grandchildren.

12.      As of the petition date, the Foxes owed $105,898 of unsecured debt.  Of that, $93,211 is credit card debt.  $2,600 is debt owed to various homeowners associations.  The remaining $10,087 is student loan debt.[2]

13.      The Foxes' schedules reflect a "net" monthly income of $13,515.35.  This number consists of the Foxes' gross wages reduced by withholding for taxes, insurance, charitable donations and a voluntary contribution of $150 a month to Mrs. Fox's 401(k) retirement plan. As noted previously, that number fails to account for the Foxes' rental income.

14.      The Foxes' schedules reflect monthly expenses of $18,103.77, leaving a purported deficiency of $4,588.42 a month.

15.      The majority of the Foxes' monthly expenses are related to real property they own.

---

[2] The dischargeability of this student loan debt was not an issue raised or addressed during the case.

16.     The Foxes own four pieces of real property: their primary residence and three rental properties.[3]

17.     The rental properties consist of two beach properties in Delaware and a home in Florida.

18.     The Foxes purchased the first beach property, a condominium, for use as a family vacation property in 2001.

19.     They purchased the Florida property as a retirement home in 2004.  The Foxes intended to use that property as a rental until they retired.

20.     As their family size increased, the Foxes wanted a larger vacation property in Delaware.  Therefore, in 2006 the Foxes purchased the second Delaware property.

21.     At the time they purchased the second Delaware property, the Foxes intended to sell both the original Delaware property and the Florida property.  However, the Foxes have not been able to sell those two properties at an acceptable price.

22.     Thus, the Foxes continued to rent out the Florida property and, since 2008 or 2009, have been renting out the two Delaware properties as well.

23.     According to their schedules, the Foxes' primary residence has a value of $434,800.00 with secured debt of $606,101.00

24.     According to their schedules, the Foxes' rental properties are worth a combined $782,534 and are encumbered by liens of $1,070,971.82.

25.     The Foxes have a total of $18,103.77 in monthly expenses, $14,646.85 of which consists of expenses relating to the real properties.  These expenses break down as follows:

---

[3] At least two of the rental properties were originally purchased for the Foxes' personal use and were only converted to rental properties at a later time.  This circumstance was discussed in the Summary Judgment Motion.

        a.        $4,176.99 a month is expenses arising from the Foxes' primary residence. Included in that amount is $486 a month toward the payment of what appears to be a wholly unsecured second mortgage. Also included are homeowner association dues, sewer assessments and maintenance.

        b.        $6,963.68 a month in mortgage payments for the three rental properties.

        c.        $3,506.18 of miscellaneous non-mortgage expenses for the maintenance of the rental properties such as taxes, insurance, association fees, and required golf club memberships.

26.     Combined, the three rental properties cost the Foxes approximately $8,000 a month more than they generate in income.

27.     The Foxes intend to keep all four properties and to continue to incur the expenses associated with all four properties. The Foxes hope is that one day they will be able to sell such of the properties as they choose to sell for a price, or prices, that reflect their perceived value.

28.     Using the figures set forth in the Foxes' schedules, if the Foxes surrendered the three rental properties instead of continuing to sustain the losses created by them, the Foxes would have $5,881.44 a month of surplus disposable income.

29.     The amount of surplus disposable income calculated by using the figures in the Foxes' schedules, however, appears to be understated because the Foxes have consistently over-withheld their taxes. In 2012, for example, the Foxes received tax refunds of $6,063.00, reflecting an over-withholding of $505.25 each month.

30.     Although some of that refund is due to the Foxes' ownership of the rental properties, that amount appears to be a small percentage of the whole. The UST contends, based upon a review of the Foxes' tax returns, that the rental properties have created significant

disallowed passive losses that would actually reduce the Foxes tax liability for quite some time if the rental properties were surrendered.

## THE PARTIES' CONTENTIONS

Section 707(b)(1) of the Bankruptcy Code provides, in pertinent part:

> [T]he court . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1).  Subsection 707(b)(3) further provides:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter . . . the court shall consider--
>
> > (A)    whether the debtor filed the petition in bad faith; or
> >
> > (B)    the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

The UST contends that granting relief in this case would be an abuse of the provisions of chapter 7 under both § 707(b)(3)(A) (the "bad faith" test) and §707(b)(3)(B) (the "debtor's financial situation" test).  The crux of the UST argument is that the Foxes can afford to repay a significant portion of their debts and thus, to allow them to simply discharge all of their debts without doing so would constitute an abuse of chapter 7.

The UST's primary contention is that the cause of the Foxes' alleged inability to pay their debts (or a significant portion thereof) is the approximately $8,000 a month loss caused by the rental properties.  The UST argues that the Foxes' intention to retain these properties and continue to incur these losses, while walking away from approximately $100,000 in unsecured

6

debt, constitutes bad faith and an abuse of the provisions of chapter 7 considering all of the

Foxes' financial circumstances.

The Foxes do not dispute the UST's contention that, in the absence of the losses caused

by their retention of the rental properties, the Foxes could repay their debts.  Rather, the Foxes

argue that their ability to repay their debts is insufficient, standing alone, to constitute abuse.

The Foxes dispute the contention that they are acting in bad faith by retaining the rental

properties and their resultant losses, and contend that, in order to prevail, the UST must show

that all factors set forth in the case of *Green v. Staples* (*In re Green*), 934 F.2d 568 (4th Cir.

1991) are met.

For the reasons stated below, the Court concludes that the granting of relief to the Foxes

– allowing them to remain in Chapter 7 and follow through on their strategy of keeping their

albatross-like real property without consequence and secure a discharge of their unsecured debt –

would constitute an abuse of the provisions of chapter 7.  For that reason, this case will be

dismissed unless, within 10 days, the Foxes voluntarily convert the case to a case under another

appropriate chapter of the Bankruptcy Code.

## CONCLUSIONS OF LAW

A.   **DEBTORS' ABILITY TO REPAY THEIR DEBTS IS THE PRIMARY FACTOR TO BE CONSIDERED UNDER THE FINANCIAL SITUATION PRONG OF 11 U.S.C. § 707(b)(3)(B).**

The parties do not agree upon the appropriate standard for determining whether the

granting of relief constitutes an abuse of chapter 7 under the "debtor's financial situation" test.

The UST contends that the critical question is whether a debtor has the ability to repay a

significant portion of his or her debts.  The Foxes, relying upon *Green, supra,* contend that the

Court must weigh various factors (including potentially non-financial factors such as bad faith)

and that something more than just an ability to repay must be demonstrated to constitute abuse.

The Foxes' reliance upon *Green* for these propositions is misplaced.  The Foxes' argument

ignores significant changes to the language of § 707(b) made after *Green* was decided, as well as

fundamental changes to the entire Bankruptcy Code brought about by the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005)

("BAPCPA").

> 1.    ***In Re Green.***

*Green* presents a simple set of facts.  It was undisputed that the debtor had $638 a month

of excess disposable income that could have been used to repay his creditors.  Nevertheless, Mr.

Green sought a chapter 7 discharge of approximately $40,000 of unsecured debt.  The United

States Trustee moved to dismiss under the pre-BAPCPA version of § 707(b).  The Bankruptcy

Court granted the motion and the debtor appealed.

At the time *Green* was decided, § 707(b)(3) did not exist.  Rather, § 707(b) provided as

follows:

> After notice and a hearing, the court, on its own motion or on a
> motion by the United States trustee, but not at the request or
> suggestion of any party in interest, may dismiss a case filed by an
> individual debtor under this chapter whose debts are primarily
> consumer debts if it finds that the granting of relief would be a
> substantial abuse of the provisions of this chapter. There shall be a
> presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b) (1991), *quoted in Green*, 934 F.2d at 570.  Under the law as it stood then, (i)

a case could only be dismissed if "substantial abuse," rather than just "abuse" was shown, (ii)

there was a presumption in favor of the debtor that chapter 7 relief was appropriate, and, (iii)

there was no statutory "totality of the circumstances . . . of the debtors financial situation" test,

the test which forms the basis for Count I of the Motion to Dismiss.

In attempting to determine what constituted "substantial abuse" under the pre-BAPCPA version of § 707(b), the Fourth Circuit opined that the purpose of that version of § 707(b) was to "[allow] a bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors." *Green*, 934 F.2d at 571; *see also id.* at 572 ("[T]he real concern behind Section 707(b) [is] abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors."). The court also focused heavily upon the statutory presumption in favor of granting chapter 7 relief.

The court rejected the holding of *In re Kelly*, 841 F.2d 908 (9th Cir. 1988), that "a debtor's possession of income in excess of his necessary expenses, standing alone, constitutes substantial abuse of Chapter 7 justifying dismissal." *Green*, 934 at 571. Instead, the court held, "in light of the statutory presumption that a debtor's Chapter 7 petition should be granted, solvency alone is not a sufficient basis for a finding that the debtor has in fact substantially abused the provisions of Chapter 7." *Id.* at 572; *see also In re Calhoun*, 396 B.R. 270, 274 (Bankr. D.S.C. 2008), *aff'd*, 650 F.3d 338 (4th Cir. 2011) ("[t]he *Green* court determined that a debtor's ability to pay could not alone establish substantial abuse under chapter 7").

In *Green* the Fourth Circuit adopted a "totality of the circumstances" test in which ability to repay was only one factor among several to be considered, including non-financial factors. The court provided the following non-exhaustive list:

1. Whether the petition was filed because of sudden illness, calamity, disability or unemployment;

2. Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

3. Whether the debtor's proposed family budget is excessive or unreasonable;

9

4.  Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition;

5.  Whether the petition was filed in good faith.

*Green*, 934 F.2d at 572.

### 2.   Congress Amends § 707(b).

As mentioned above, *Green* represented a rejection of the law in the Ninth Circuit where a debtor's ability to repay, alone, was held to be sufficient to justify dismissal under § 707(b). This split in authority continued after *Green* with *Green* in the minority.  *See In re Attanasio*, 218 B.R. 180, 211 (Bankr. N.D. Ala. 1998).[4]  In 2005, Congress enacted BAPCPA.  One of its purposes was "to ensure that debtors repay creditors the maximum they can afford."  *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 131 S. Ct. 716, 725 (2011) (quoting H.R. Rep. No. 109-31, pt. 1, at 2 (2005)).  In part, to accomplish this goal, Congress significantly amended § 707(b).

First, Congress modified the standard for dismissal from "substantial abuse" to just "abuse," a clear, simple signal that a lesser benchmark would now control.  *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007) ("Congress has clearly lowered the standard for dismissal in changing the test from 'substantial abuse' to 'abuse'.").

---

[4] For cases finding ability to repay alone was sufficient to constitute "substantial abuse," *see In re Behlke*, 358 F.3d 429, 438 (6th Cir. 2004) ("Ability to repay alone may be but is not necessarily sufficient to warrant dismissal."); *In re Lamanna*, 153 F.3d 1, 5 (1st Cir. 1998) ("[W]e hold that a bankruptcy court may, but is not required to, find 'substantial abuse' if the debtor has an ability to repay, in light of all the circumstances."); *United States Trustee v. Harris*, 960 F.2d 74, 76-77 (8th Cir. 1992) (rejecting *Green* and holding that ability to repay "alone" is sufficient to warrant dismissal for substantial abuse); *In re Austin*, 299 B.R. 482, 485 (Bankr. E.D. Tenn. 2003) ("the debtor's ability to repay his debts may alone be sufficient to support a finding of substantial abuse"); *In re Burger*, 280 B.R. 444, 446-47 (Bankr. S.D. Ind. 2002) (adopting the Sixth Circuit test under which, in the absence of mitigation circumstances, the ability to repay "alone may be sufficient to warrant dismissal"); *In re Rubio*, 249 B.R. 689, 698 (N.D. Tex. 2000) (debtor's ability to "make significant payment to her creditors . . . alone warrants dismissal under § 707(b)").  For cases finding that something more than ability to repay was necessary, *see Stewart v. United States Trustee* (*In re Stewart*), 175 F.3d 796, 809 (10th Cir. 1999) ("[w]hile we agree ability to pay is a primary factor in determining whether 'substantial abuse' occurred, we believe other relevant or contributing factors, such as unique hardships, must also be examined before dismissing a Chapter 7 petition"); *In re Pryor*, Case No. 97-11527, 1998 WL 34066139 at *3 (Bankr. S.D. Ga. March 19, 1998) ("[d]ebtors' future income and ability to repay their debts is a primary factor in finding substantial abuse, but standing alone this factor is insufficient to warrant dismissal")

Second, Congress eliminated the presumption in favor of granting the debtor relief. *Witcher v. Early* (*In re Witcher*), 702 F.3d 619, 622 (11th Cir. 2012). It was this presumption that the *Green* court identified as convincing evidence that solvency alone was insufficient to justify dismissal under the old version of § 707(b). *Id.* at 572 ("[I]n light of the statutory presumption that a debtor's Chapter 7 petition should be granted, solvency alone is not a sufficient basis for a finding that the debtor has in fact substantially abused the provisions of Chapter 7.")

Third, Congress, for the first time, provided some guidance as to what constitutes "abuse" under § 707(b) by enacting § 707(b)(3). § 707(b)(3) provides that in considering whether granting relief would be an abuse of chapter 7, the Court must consider (a) whether the debtor filed the petition in bad faith or (b) whether the "totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." The use of the word "or" demonstrates that the two tests of § 707(b)(3) are disjunctive and that abuse can be found if either of the two tests indicate abuse. *In re Webb*, 447 B.R. 821, 823-24 (Bankr. N.D. Ohio 2010); *In re Reed*, 422 B.R. 214, 233 (C.D. Cal. 2009). With respect to the financial situation test, although the phrase "totality of the circumstances" is reminiscent of the *Green* test, the addition of the further qualifying language, "of the debtor's financial situation" clearly indicates that the Green test has been altered. Now, § 707(b)(3) is expressly limited to consideration of the debtor's "financial situation."

3. **Under 707(b), the Debtor's Financial Circumstances Must Be Evaluated for a Lower Level of Abuse Then Previously Allowed.**

In light of the changes to the language of § 707(b), specifically the lowering of the dismissal standard from "substantial abuse" to "abuse," the elimination of the presumption in favor of relief, and the express focus upon the debtor's financial situation, this Court concludes

11

that the *Green* standard cannot be blindly followed in the way the Debtors advocate. The statute requires the Court to consider the "totality of the circumstances . . . of the debtor's financial situation." Thus, the factors in *Green*, as well as any other factors bearing on the debtor's financial situation, must be considered but only to the extent that the factors are relevant to the Debtors' financial circumstances. *See e.g., In re Smith*, No. 09-691, 2009 WL 4262842 at *4, n.5 (Bankr. N.D. W.Va. Nov. 23, 2009). The ability to pay – which is at the heart of the Debtors' financial circumstances – should be afforded greater significance.

There is general agreement in the lower courts of the Fourth Circuit that the BAPCPA amendments have weakened the hold of the *Green* standard. However, there has been disagreement about whether or not a debtor's ability to pay creditors standing alone is sufficient to warrant dismissal for abuse. *Compare In re Sonntag*, No. 10-1749, 2012 WL 1065482, *4 (Bankr. N.D. W.Va. Mar. 28, 2012) ("While declining to abrogate the *Green* decision by holding that ability to pay alone is sufficient to find abuse, this court concludes that ability to pay may weigh significantly in the court's determination of abuse under § 707(b)(3)(B)."); *with Calhoun*, 396 B.R. at 275-76 ("This Court now holds that, while the totality of all of the debtor's financial circumstances must be examined, the ability to pay a significant dividend to creditors and the failure to do so standing alone can be an abuse of chapter 7, absent mitigating factors.")[5]; *In re Richardson*, No. 07-60057, slip op. at 16 (Bankr. W.D. Va., Mar. 19, 2008) ("Because this Court does not believe that the Fourth Circuit would reach the same holding under the BAPCPA as it did in *Green*, it is concluded that a debtor's ability to pay, standing alone, may form the basis for dismissal under Section 707(b)(3)(B) when considered in light of the debtor's other financial circumstances."). While this Court agrees that ability to pay must be given greater weight under

---

[5] Although the result in *Calhoun* (*i.e.* a finding of abuse) was affirmed by the Fourth Circuit, the Fourth Circuit did not reach the issue presented here.

12

Section 707(b)(3) than under the prior Section 707(b) analysis, the Court declines to determine whether or not ability to pay alone is now sufficient to warrant abuse. This is so mainly because in this case, the totality of the Foxes financial circumstances, even considering potential mitigating factors, warrant dismissal.

**B.     THE FOXES HAVE THE ABILITY TO REPAY A SUBSTANTIAL PORTION OF THEIR DEBTS.**

          1.     <u>**The Cost of the Rental Properties Constitutes Disposable Income**</u>.

"The Bankruptcy Code requires a meaningful and realistic budget, accompanied by the devotion of most of the debtor's surplus income to repay creditors." *In re Stout*, 336 B.R. 138, 142 (Bankr. N.D. Iowa 2006). "[D]ebtors are not required to live as paupers; neither are they allowed to continue an extravagant lifestyle at the expense of creditors." *Id.* "Only expenses reasonably necessary for the maintenance or support of the debtor or the debtor's dependents are allowable for a Section 707(b)(3)(B) analysis." *In re Dowleyne*, 400 B.R. 840, 844 (Bankr. M.D. Fla. 2008).

Maintaining three rental properties at a monthly loss of approximately $8,000 is not reasonably necessary for the maintenance or support of the Foxes or their dependents. If the Foxes surrendered the rental properties and stopped incurring this loss, based on the figures presented in their own schedules, the Foxes would have a monthly surplus of $5,881.44 that could be put toward repayment of their debts. That would create $352,886.40 over the life of a 60 month plan of reorganization.

The Court in *In re Lorenca*, 422 B.R. 665 (Bankr. N.D. Ill. 2010), considered a nearly identical situation. The Lorencas owned a rental property that was a former home they were unable to sell due to the depressed real estate market. *Id.* at 667. The rental property generated income of $1,300 a month but cost the Lorencas $1,782 a month for a net loss each month of

$482. *Id.* Despite the monthly loss, the Lorencas planned to keep the rental property "in hopes

of a better real estate market to come." *Id.* In dismissing the case as an abuse of the provisions

of chapter 7, the *Lorenca* Court explained:

> [T]he Debtors' argument that they cannot afford any payment to
> creditors is disingenuous. They plan to reaffirm ... the mortgage
> debt on their former home which now brings in some rental
> income . . . . Instead, they could use their expenditures now made
> in saving the old house to pay their creditors. The old house costs
> $482.00 a month more than it brings in. If Debtors can pay that to
> save their former house, they can pay it to creditors.
>
> *    *    *
>
> Instead of belt-tightening . . . the Debtors are asking that they be
> allowed both to keep their investment property as well as their
> residence. The investment property is in substance a savings plan
> for the Debtors, as eventually they would reap the benefit of any
> equity which the property accrues should market values rise.
> Keeping that property would defeat the purpose of the Code which
> seeks to have debtors pay what they can to creditors. They can,
> without stress, abandon the former home to foreclosure and use
> some part of their present payments on expenses for that property
> toward payment to their unsecured creditors in a Chapter 13 plan.

*Lorenca*, 422 B.R. at 674-75.

2.      **The Foxes over-withhold their taxes.**

The Foxes consistently over-withhold their taxes resulting in significant tax refunds. Tax

refunds, which are the result of over-withholding, constitute disposable income for purposes of

the § 707(b)(3) financial circumstances test. *In re Kehl*, 463 B.R. 19, 23 (Bankr. E.D. Mich.

2011); *In re Jacob*, 447 B.R. 535, 543-44 (Bankr. N.D. Ohio 2010); *In re Daniels-Brown*, No.

08-11121, 2008 WL 4936387 at *2 (Bankr. D. Md. Nov. 12, 2008). As noted above, in 2012,

the Foxes received refunds of $6,063. That equates to more than $500 a month of over-

withholding that could be used to repay creditors. Over the course of a 60 month plan of

reorganization, that would be an additional $30,000 available for creditors.

14

**3.      Mrs. Fox is Putting Away $150 a Month Toward Retirement Savings.**

Each month, Mrs. Fox puts $150 into her voluntary 401(k) retirement fund.  Generally, it

is inappropriate for chapter 7 debtors to contribute to their own retirement ahead of repaying

creditors and, thus, this amount constitutes disposable income.  *See, e.g., Anes v. Dehard* (*In re*

*Anes*), 195 F.3d 177, 180-81 (3d Cir. 1999) ("Voluntary contributions to retirement plans . . . are

not reasonably necessary for a debtor's maintenance or support and must be made from

disposable income."); *In re Kaminski*, 387 B.R. 190, 197 (Bankr. N.D. Ohio 2008) ("absent

unique circumstances, a debtor's ability to pay their debt cannot take into account deductions

made for 401(k) loans and contributions. The reason: it would be unfair to allow a debtor to

commit a part of their earnings to the payment of their own retirement fund while at the same

time paying their creditors less than a 100% dividend); *see also Daniels-Brown*, 2008 WL

4936387 at *2 (recognizing that courts have held that it is inappropriate to include contributions

to retirement funds "as a deduction in making a 11 U.S.C. § 707(b) calculation").  Inclusion of

these payments for the benefit of creditors would be an additional $9,000 over 60 months.

**4.      The Foxes Maintain a Large Housing Expense.**

The Foxes maintain a monthly housing expense of over $4,000.   That consists of

$3,234.33 for a first mortgage, $300 a month for homeowners association dues, and $486 a

month for a second mortgage.  The Foxes' schedules indicate that their second mortgage is likely

wholly unsecured.  If the Foxes schedules are accurate on that point, then that lien may well be

subject to avoidance in a reorganization proceeding.  *See In re Millard*, 414 B.R. 73 (D. Md.

2009) (wholly unsecured second mortgages are subject to avoidance in chapter 13 proceedings).

If that lien was avoided, that would create an additional $29,160 of disposable income over a 60 month reorganization.[6]

## C.      THE *GREEN* FACTORS ALL SUPPORT A FINDING OF ABUSE.

### 1.      The petition was not filed because of sudden illness, calamity, disability or unemployment.

The Foxes did not file their petition because of any sudden illness, calamity, disability or unemployment.  The Foxes are in good health and both have maintained steady, regular and lucrative employment.  The Foxes have argued that their "financial problems are the result of a sudden, dramatic, and unexpected downturn in the real estate market."  According to the Foxes, this downturn precluded them from selling their real properties and has caused them to rent those properties at a loss.  Assuming that assertion to be true, such a downturn in the real estate market is neither sudden nor in the nature of an "illness, calamity, disability or unemployment."  It is simply a reflection of recent history embodied by investments that have gone bad.  *See In re Coyle*, No. 10-03476-8, 2011 WL 5902739 at *3 (Bankr. E.D.N.C. June 29, 2011) ("[T]he court does not consider the recent downturn in the economy to be a 'calamity' that would weigh against abuse.").  Moreover, the downturn in the real estate market, and its effects upon the Foxes as it relates to this case, is hardly sudden.  The Foxes filed this case in 2012.  The real estate market downturn occurred years ago.  The Foxes testified that they started trying to sell their properties in 2006 and testified that they have been renting their properties out because they could not afford them since at least 2008.  Thus, the problem was not sudden when they filed but was decidedly gradual.

---

[6] The Court is not rendering an opinion on the avoidability of the Foxes' second mortgage at this time.

2.      **The Foxes made consumer purchases far in excess of their ability to repay.**

The Foxes have made consumer purchases in excess of their ability to repay.  The Foxes incurred over $90,000 of credit card debt they say they cannot repay.  Additionally, while they may have been able to afford their properties when they purchased them, since at least 2008 the Foxes have not been able to afford them.  Indeed, that is why they started renting them out.  Yet, the Foxes continued to retain all their properties since that time and still want to retain them.

3.      **Is the Foxes' proposed family budget excessive or unreasonable?**

The Foxes proposed budget is excessive and unreasonable.  The Foxes propose to spend $10,000 a month to retain three rental properties that generate about $2,000 per month and have other expenses which are unusually large.

4.      **Do the Foxes' schedules and statement of current income and expenses reasonably and accurately reflect their true financial condition?**

If this factor is still relevant, it would auger in favor of dismissal.  First, the Foxes failed to disclose any income from their rental properties on either their schedules or their statement of financial affairs despite the fact that the properties do generate approximately $2,000 a month.  Thus, those documents do not accurately reflect the Foxes' financial situation.  Rather, the documents indicate a financial situation that is worse than their actual financial situation.  Furthermore, the Foxes schedules also omit at least one asset (an automobile).  Finally the Foxes originally identified their debts as "primarily consumer debts."  In response to the UST's motion to dismiss, the Foxes amended their petition to indicate their debts were not "primarily consumer debts."  That amendment was both inaccurate and legally unsupportable.  The result of that amendment was to cause the UST to expend resources filing a motion for partial summary judgment to which the Foxes never even bothered to respond.

**5.**      **Was the petition filed in good faith?**

Again, this factor does not implicate the Foxes' financial situation and, in fact, is the subject matter of another provision of § 707(b)(3). Nevertheless, as discussed in more detail below, the petition was not filed in good faith. Attempting to retain rental properties that lose money while not paying unsecured creditors does not constitute good faith.

**D.      THE FOXES FILED THE PETITION IN BAD FAITH.**

Although the majority of the arguments in this case went to the issue of the appropriate standard for abuse under § 707(b)(3)(B), the UST also asserted a count for dismissal under the bad faith test of § 707(b)(3)(A). The Foxes' actions in this case support the conclusion that the Foxes filed their petition in bad faith. First, the Foxes failed to disclose any income from their rental properties. Second, the Foxes' schedules omit an automobile they own. Third, the Foxes' amendment of their petition to reclassify their debts from "primarily consumer debts" to the opposite was both inaccurate and legally unsupportable. Material misrepresentations and omissions in one's bankruptcy papers constitute just one of many factors that a court may consider in determining whether dismissal for bad faith is appropriate under § 707(b)(3)(B). *See In re Ricci*, 456 B.R. 89, 101 (Bankr. M.D. Fla. 2009). Accordingly, the dismissal of the Foxes' cases is appropriate for this reason as well.

## CONCLUSION

For the reasons stated above, the Court will enter a separate order dismissing this case within 10 days' time unless, prior to the expiration of that 10 days, the Foxes voluntarily convert their case to a case under another appropriate chapter of the Bankruptcy Code.

**End of Opinion**